Good morning. May it please the court, my name is Greg Laurie. It is my distinct privilege to come before the court this morning on behalf of America's commercial beekeepers. Unfortunately, we're here because the beekeeping industry is at a state of crisis. All across the nation, bees are dying at rates that are simply without precedent. And of course, these bees provide us with a great deal more than just honey. One-third of our diet comes from crops that will not make food unless they are first visited and pollinated by a bee. We're on track here for a major agricultural disaster. Now, there is increasing evidence recognized by both EPA and US Department of Agriculture that the crisis we're facing is the result of years of widespread use of systemic insecticides. And this case challenges EPA's decision to approve a new systemic insecticide called sulfoxiflor. EPA's decision to register sulfoxiflor is unlawful because EPA's conclusion that sulfoxiflor will not have an unreasonable adverse effect on honeybees is unsupported by substantial evidence. In fact, the record shows... Are we suggesting that they lack sufficient data in the form of Tier 2 semi-field studies? Is that the situation? Your Honor, what we are showing is that at the end of the assessment, they found a risk of concern to bees. That's where they came to at the end of the risk assessment after the mitigation measures were in place. And so that brought them to the fundamental question of, do the costs associated with registering this new to the benefits associated with registering sulfoxiflor. I understand that, but in order for us to overturn the EPA's decision, we have to suggest that they somehow have failed to comply with their procedure, don't we? No, Your Honor. You have to determine that their ultimate decision is unsupported by substantial evidence. Now, we contend that that was one hiccup on the road, one error on the road that got them to this conclusion that the costs outweigh the benefits, but that's just the path that gets there. I might begin by taking a few moments to discuss this risk assessment process that EPA employed, because it seems somewhat complex, but at the end of the day, it actually is fairly straightforward. Well, I'm just trying to focus you just a little bit, because there won't be anybody here who hasn't read your briefs and even maybe waded through most of the stuff you submitted already, and my worry is I'm trying to determine what the EPA did wrong, or why wasn't there sufficient evidence, and it seemed to me that what you're really asking is, did they have sufficient data in the form of Tier 2 semifield studies? Would that be correct? Your Honor, that is one argument that we've made, but again, that is a subsidiary argument along the chain that gets you to what, undisputably, EPA found, that with the information that they had, and with the mitigation that they ended up employing, at the end of all of that, they still found a risk of concern to bees. So once you get to that fundamental crossroads, then the question becomes, what are the costs and benefits? Can we register? So you don't have to take our word for it. At this point, you can look to But let's assume, for the sake of argument, that it was sufficient. Given the mitigation measures that they had, which we contend were insufficient, but they, again, they are what they are, EPA runs its analysis, goes through its risk assessment, and comes to the conclusion that there will be a risk to bees. Now, when does this risk assessment take place? The risk assessment takes place after EPA has received the information, the data from the registrant, and also has, that's essentially when it begins. So that's early on, they take the data in, they take in the proposed label that has the application rates and what the various restrictions are going to be, and they say, okay, they try to estimate what will the exposure be to bees. If they find that exposure based on that they proceed and they say, okay, well now, given our regulations, we need to look at field studies. And these field studies are different than the tier one studies. These look at field scenarios. I see there's a question. Well, it's going back to Judge Smith's question. Initially, there was a conditional registration, correct? There was. And a directive that further stage two studies be conducted, correct? Yes. Okay. So, and then there was later determination that no additional studies were needed by reexamining some of the studies that previously had been evaluated. Is that right? That's precisely right. There wasn't much passage of time there. There was no new information that came in. But what they did really, as I understood it, and I guess that's what I was trying to get to, is what they did really is they took the studies. The studies were really based on trying to get to a certain 0.133 pounds of active ingredient. And that wasn't achieved. No question. I think the EPA even agrees that wasn't achieved. So, what they issued was for less, right? Yes. And what we're really asked to suggest is, is the lesser allowance by the EPA supported by sufficient evidence? And, Your Honor, it is not. Because if you... Well, I understand. But I'm just trying to make sure that's what you're addressing. Because at this point, they're not going for the 32% less, Your Honor. Yes. Okay. You call it 32%. All right. I'll just take your 32%. I don't want to say far if that's not where you're going. But even if we take that, then we have to say, is there enough, is there sufficient evidence to support the determination on the lesser amount, right? Okay. So let me address that point squarely. The final decision document re-crunches the numbers at that reduced rate, at that 32% rate reduction. Nothing of significance changes. They find that at the 32% reduction, the level of concern is still surpassed. So now they come back in their briefing and argue, well, it's closer. But this is the close enough argument that the court rejected recently in the NRDC case involving NanoSilver. The bottom line is, the level of concern is still exceeded even at the reduced rate. So again, this is why in the final decision document they are forced to get to that final question of, okay, we acknowledge there is a risk even at the mitigated rate. And at that point, they need to do the cost-benefit analysis, which we contend was not done. And we can get to that point in a little bit. But I want to make sure the Court is very clear on this point, that reducing the application rate did not succeed in getting you below that level of concern, EPA's level of concern, the .4 level of concern. And it didn't, frankly, address the problems associated with the Tier 2 analysis that EPA identified in its brief. I can go through why that is if the Court's not clear. But if you read the final decision document, you will see that they say, look, we acknowledge, even at the reduced rate, even at the 32% reduced rate, the Tier 1 analysis is still inconclusive with respect to what this pesticide is going to do to honeybee colonies. So let me turn then if I... And the fact that they say it's inconclusive suggests then they cannot issue the directive they did. Well, what it means is that we are left... I mean, that seems to be your argument, which I'm not sure I quite get to. I would respectfully, Your Honor, I would state it differently. At that point, what we know is that the Tier 1 analysis shows a risk, shows an exceedance of the level of concern, and the Tier 2 analysis is inconclusive. So what do we have? All we have is evidence showing a risk. We don't know the magnitude of that risk to the hive necessarily, but we know that there is a risk. So again, that's why EPA gets to this cost-benefit determination, is forced to go there. I would represent that it is unusual that EPA finds itself in this situation where the mitigation measures actually don't succeed in reducing, in their mind, the risk. Normally, they don't get to that point of having to balance the cost-benefit. Normally, they just declare that all the risk associated with the pesticide has been mitigated. And your case, which would suggest that in a similar analysis with the same kind of an approach, we would have said, or some other court would have said, that's not enough for them to issue the directive they did, is what? Well, Your Honor, to be clear, EPA can register a pesticide, notwithstanding there being some risk. Well, I understand. That's why I'm getting there. Okay. And that is because the definition of an unreasonable adverse effect under FFRA, it's a legal term of art under FFRA, that phrase is defined to mean, quote, I'm quoting from Section 136BB of FFRA, an unreasonable adverse effect is any unreasonable risk to man or the person to account the economic, social, and environmental costs and benefits of the use of the pesticide. So, EPA can register a pesticide, notwithstanding some risk, if it pays the cost and benefits, right. And so, here, they looked at only the benefits associated with registering sulfoxyfluor. They canvassed some agricultural extensions and said, hey, do you need this stuff? And they said, sure, it would be nice to have. EPA dismissed the costs associated with further bee declines on the grounds that bees are not essential for most of the crops that will be sprayed with sulfoxyfluor when they are in bloom. Now, what's missing from this entire analysis is, what about the costs to the beekeepers? Clearly, bees are essential to beekeepers. And this, again, is an industry that is at the point of collapse. I want to read a quote. It's a short quote. It begins, since 2006, an estimated 10 million beehives at an approximate current value of $200 each have been lost. And the total replacement cost of $2 billion has been borne by beekeepers alone. That's from the USDA report in 2012. So, this is already so many years old. But EPA is asking us to say that it's reasonable to put increased risk on this reeling industry without ever telling us what's actually at stake in terms of livelihoods, in terms of economic benefits. And again, these bees that may not be essential for pollinating the crops that EPA happened to look at, they are the same bees that are essential for pollinating many of the crops that are the most important crops out here in the West. EPA seems not to have grasped that beekeeping is a migratory industry. These folks put the beehives on tractor-trailer trucks, and they drive them around the country following the bloom in various places. So, if you lose the bees in the cotton fields in the South or the soy fields in the Midwest, that may not have an impact on those crops because they don't need bees. But those bees then are gone. They cannot be brought West to pollinate, for instance, the almond crop in California, this state's single biggest agricultural crop, excess of $2 billion each year. The apple and cherry blossoms in Oregon and Washington, these are the same bees. There's no accounting for this cost. There's simply a dismissal of this whole problem. So that, Your Honor, we contend is a fundamental violation of FFRA. Is this related to your argument? Isn't this really a version of the argument that in Tier 2, they didn't have any adequate information on the effect on the hives and the colonies? Or is this separate from that? It is separate, Your Honor. That sort of quantification of the risk, that happens over here in the risk assessment. And they determined that there is a risk. Now, once you find that there's a risk, you have to determine what's at stake. If you go to a casino, you want to know, what are the odds and what am I wagering? And they have told us that we're taking a risk. But they have not told us what we stand to lose in terms of the beekeeping industry and in terms of the crops that rely on bees for pollination. Why do you contend that the Tier 2 testing was inadequate with respect to the reduced level? In other words, what is it that you contend was deficient about the EPA's reliance on those Tier 2 studies when it re-evaluated at the maximum application rate of 0.09? It's a very good question, Your Honor. There were six, what were submitted were six studies under the pretext of Tier 2. Four of those studies, the Schmitzer studies, they're Schmitzer, Nunn, A, B, and C. All of those studies analyzed a rate of only up to 0.043 pounds of active ingredient per acre. So still far less than even the reduced rate. So to the extent that EPA wasn't happy with them when they were looking at the 0.133 rate, that same issue, and indeed in the brief, in EPA's answering brief, it concedes that they did not rely on those studies. They were inapplicable. Now, so that leaves us with two. Yethir and Hectoroth. The Hectoroth and Yethir study, right. So the Yethir study, EPA is very clear. That was a residue study. That was meant to determine how much pollen and nectar are bees collecting. It wasn't meant to figure out what is the impact of that pollen and nectar on the hive. It was a residue study. It didn't have a control group. It had no basis for quantifying biological effects. Finally, we have the Hectoroth study, and EPA is clear that in that case, there was no control group. The control group failed. And there was also a very, very short observation period. They only looked at the hive for only seven days after the study was done, which isn't sufficient to determine whether the exposure is, in fact, having an impact on the brood. So that's why, at the end of the day, EPA looks at those studies, and in the final decision document, you will say that they concede it's inconclusive with respect to brood development, and we are going to do this risk-benefit, or the cost-benefit analysis. If I could, I would reserve the rest of my time for rebuttal. All right. Thank you. May it please the Court. My name is John Thomas Doe, and I'm here for the United States. At counsel's table with me is Ms. Erin Cook of the U.S. EPA, Mr. David Weinberg, and Mr. Craig Flanser of Council for Intervenor Dow Agro-Sciences. With the Court's consent, I'll be speaking for 15 minutes, and Mr. Weinberg will be speaking for five minutes. In this case, after EPA determined that sulfoxifer did not pose a risk to human or a potential risk to the environment, EPA approved the registration of sulfoxifer in light of its many benefits. Now, to assist the Court in resolving whether EPA's final registration decision is supported by substantial evidence, I'd like to focus on three main points on how EPA came to this conclusion. First is EPA's consideration of Tier 2 studies. This consideration was consistent with the FFRA statute and EPA's implementation regulations, which provide for a large degree of flexibility in terms of what data it requires. You're talking about the Tier 2 studies. Which ones are you talking about? EPA considered all six Tier 2 studies. However, they considered each one for different aspects. The Tier 2 studies were used to study brood development, direct effects, and colony strength. But the Tier 2 studies were also used to refine its Tier 1 analysis. So, depending on which study EPA relied on it, only to the degree which it found it significant enough to do so. Were there any studies in the six that were done using the amount of, if you will... 0.09? Right. Yes. Yes, two of those six did study the 0.09 application rate or higher. Why are the other four relevant? The other four are relevant because... Good question. That was a good question. Because I only know two that I thought were even relevant then. Well, the other two are so relevant that despite the fact that they may have used a lower application rate, the design of the study nonetheless allowed EPA to examine whether or not, for instance, there was going to be a catastrophic failure of the brood, for instance. At none of those levels, for instance, did EPA notice a catastrophic event with regards to the brood. So, that's just one example. But it seems to me that it's hard to make that determination when the other studies are at a less application rate, even what you're arguing. But nonetheless, there were those two studies that did study that amount that EPA... Well, I'd make them relevant, but I'm still having a tough time why the others were relevant at all. So, I'm left with, in my analysis, saying if EPA has anything, it has two studies. I would point to the fact that, for instance... I mean, the problem comes, and I hate to have you stop on that. The problem comes in that nobody really was trying to test that particular rate at the time. They were going for a higher rate. That is correct, Your Honor. And they were trying to put together tier two studies to make the higher rate work. So, they came in with six studies, two of which just happened to be the rate EPA chose. And now EPA is trying to suggest that that's enough to make that absolute determination. And that's the worry that I have. They weren't even studying that. And we got two studies which were submitted simply to try to help with the higher rate. And we adopted the two. And the others, we didn't adopt. When they were... Why didn't we adopt those? So, I think it's important to understand... In those studies. Why didn't we? I think it's important to understand the context of this decision. This is the first time that EPA applied the pollinator risk assessment framework involving these tier two semi-field studies to a registrant. And these studies were done prior to EPA's process. Were done for this purpose. No. And it's quite common for registrants to rely on studies used for other purposes. And it's important that even though a study may not have been submitted for a specific purpose, EPA can still look at the design of the study and draw out specific information for its own purposes. Which is what EPA did here. And there's no golden number with regards to the number of tier two studies that is necessary. Whether it's one, two, five, or six. At the time of the conditional registration, did the EPA require, call for new studies to be done by Dow? So at the time that EPA proposed a conditional registration, it did ask for additional information in the form of tier two studies. Or other tier two studies. However, it was expressly done in order to support the higher, the original rate that Dow AgroScience wanted. Which was the .133 active ingredient pounds per acre. So once EPA essentially reassessed that need for that additional information, because once EPA lowered the rate to a lower rate, the lower .9, and I should note that some uses actually use less than .9, .09, excuse me. Those additional studies EPA found were unnecessary. And certainly EPA is not in the business of having businesses go through the onerous task of, an expensive task of doing studies which EPA ultimately decides is no longer necessary. And then having EPA go through the entire process again with them. Are you saying that at the time of the conditional registration, it had been determined that a .09 level would be acceptable? Just to clarify, it was a proposed conditional registration. But yes, at that time, when EPA was proposing that it be a conditional registration, EPA must make an assessment, essentially the same risk benefit assessment, prior to conditionally approving a registration. That's not, I don't think I'm understanding it. What I want to know is, at the time of the potential conditional registration, was there anything in the administrative record that shows that the EPA had determined that at a .09 level, it would not, it would be appropriate to proceed with registration? Yes. So there isn't any different data between the period of conditional, the proposed conditional and the final unconditional. So all that information is yes, in the record. It's the same information that EPA. But did the EPA reach that conclusion? Yes. If you look at the proposed conditional registration, it's expressly clear that EPA believed that at the .09 level, EPA did not think there would be unreasonable adverse risks, adverse effects, during the period in which EPA would solicit additional information. Thank you. So we've spoken about. Can you give us a site for where that is explained? Sure. The, I'm sorry, Your Honor, I do not have that site in front of me, but I'm sure my intervener's counsel will be able to point it out to you. But it is, there's essentially two, it's right before the decision document of the final unconditional registration. And it. I thought you said it was part of the conditional registration. I mean, it comes right before in the administrative, in the excerpts of record, Your Honor. So I've spoken about those tier 2 studies. But another point that I want to stress is the fact that FFRA is a cost benefit, risk benefit statute. It, therefore, EPA, as it did here, can approve a registration of a pesticide even when there is some risk or uncertainty. So whatever uncertainty or risk that might have been left after EPA's analysis of those tier 2 studies, EPA can nonetheless approve that registration. Now, petitioners would contend that essentially EPA can't approve a registration if the risk quotient is higher than the level of concern. Now, in this, but that simply can't be true, in that there may be instances where no amount of mitigation or no amount of study can lower a risk quotient below a level of concern. But nonetheless, EPA, by the statute, can balance those risks and uncertainties with the number of benefits a certain pesticide provides in this case. Before we get to that particular issue, there's still one thing that concerns me and I guess I haven't been totally convinced. It seemed to me that all of the limitations or one of the significant limitations in the studies was that all the application rates tested were far below the maximum sulfur I don't know how to say that. Just take it as S from Idaho. All right. Application rate proposed by the .033. But it seemed to me that they also suggested that the studies did not comply with the Organization for Economic Coordination and Development's guidance on how best to perform B semi-field tests. In fact, some of the studies had inadequate controls. One of the studies was designed to measure the residue in a nectar and pollen and not to measure the biological effects. We got to that point and then all of a sudden we said, we're done. We don't have to worry. We're just going to diminish this to .099 and we're going to approve it. But yet, I got no study that, as I understand, complies with what the EPA suggests is the Organization for Economic Coordination and Development's guidance. Those studies that were put in didn't. They were going to get some more stuff and then all of a sudden changed their mind, lowered the rate, and went on. Two points. One, I don't think EPA changed its mind in that, again, originally during the proposed conditional registration, the additional studies were only going to be used to support a higher rate. So EPA was consistent in its thinking there. But with regards to your point about... Well, you can argue it the way you want to. It seems to me like a change of mind. But go ahead. Why? How does anything that we now, the EPA is going to... Two studies they got they're relying on, Tier 2 studies, and those don't comply with the OECD guidance. Well, as you suggested earlier, those are suggested guidelines that EPA has in its regulations. And you may have a study which perhaps follows all the guidelines that perhaps EPA provides, but nonetheless, the data that it provides isn't useful to EPA. And conversely, you can have studies which perhaps deviates from certain guidelines, but nonetheless provide useful information. So if I could use an example. So one of the issues is timing, the amount of times some of these studies were monitored for. That is something that EPA candidly recognizes is a limitation, and which is one of the reasons why, for instance, EPA recognizes that there is still, EPA can't preclude long-term effects on brewed development. Well, yeah, but there's certain aspects of the scientific method that are important, like control. So some of these controls weren't necessarily concurrent, that they didn't necessarily occur at the same time, but there were control groups that were sufficient for EPA to nonetheless credit it. So EPA found that these studies were, they were categorized as supplemental, meaning they were providing useful information, but with limitations. And so each time... But they're the basis for the, you're arguing that they're the basis for what they, for the approval. It's not the entire basis for the approval, and I would highlight that the risk to bees is one of many considerations that EPA looked at. And so where EPA does not necessarily have information or... I'm sorry? Aren't we looking at the Tier 2 information that was supplied? We, in this particular case, yes, we are. Okay. I just want to make one more point. Was there any study of the two which was able to provide competent data on the effects of acid on brewed development and long-term colony health? On long-term brewed development, no, Your Honor. Or on long-term colony health? In terms of colony strength, all the studies that were examined did not... So we have... This is the thing that most concerns me. I mean, I have all these regulations in front of me that says the EPA can require or not require whatever data or information they need in order to make the regulatory judgments. I've looked at 40 CFR 15830, and I read it, and I'm generally well in mind. But now, here's what I have. I have an EPA who's saying, as to this level of application, we can't make it. We can't make it because the level's too high. We got to have Tier 2 studies. And not only that, it doesn't meet what we've suggested you need to meet, which is the guidance. And they don't have any effect. So then, without any doing that, then they all of a sudden decide, I won't say change their mind, a new level, which you say they've always considered. I've got to read that one more time. I don't think it was all there, but I'll read it. And now we're going to come out, and all of the problems with those two studies still exist. They don't meet the OECD guidance. They don't test the effects of the poison, if you will, on brew development. They don't test the long-term colony health, and yet you're going to rely on them. That's my problem. Well, I want to point out, it wasn't solely on those studies, but EPA also considered, of course, mitigation measures, so that when there is perhaps a gap in the data, the risk can be addressed through other means, which is what EPA did here. The guidelines provide, or the Pollinator Risk Assessment Framework provides that when there is a risk quotient higher than level of concern, EPA can mitigate, and which is one of the things that EPA did here. Now, I understand I'm getting into the time I... There has to be some support for the amount that you mitigate and for the assessment of the risk at that level. I don't see that here. Well, in cases in which EPA must deal with prediction, there may not be studies that necessarily can consider some of the information that ideally EPA would like. For instance, some of these mitigation measures, EPA can't necessarily plug in and quantify it. All right. I worry with the mitigation studies, and I'll let your... You don't need to worry about the time. I'll give him all the time. Thank you, Your Honor. If you gave him five minutes, I'll give him five. But my worry about this is this. Every time I turn around, we go to the mitigation measures. The mitigation measures rely on the same Tier 2 studies that the original decision was made. I mean, I don't... And then if I don't think they measure up, then why do I use those to support the mitigation measures? The mitigation measures are not necessarily reliant on the Tier 2 studies. They are reliant on actually... You're not reliant on anything. No, Your Honor, I would disagree in that they are reliant on essentially common sense. For instance, EPA put in mitigation measures about when the product can be used. It's not... How is that enforced? It is enforced, but, Your Honor, the states, in this case, have enforcement authority for misuse of a product. EPA examined all the uses for this proposed uses of this particular product and then tailored mitigation measures for those uses, depending on how attractive bees are to those particular crops. Again, blooming crops, clearly bees are attracted to crops when they're blooming. EPA limited the time in which a person could use it from three days prior to bloom until petal fall, for instance. For crops in which they bloom continuously, it wouldn't make... EPA, for instance, lowered the application rate even further. I don't have any further questions. We'll let your colleague get up and give his five minutes. Thank you, Your Honor. Thank you for your argument. Thank you, Your Honors. My name is David Weinberg. I'm here to represent intervener Dow Agrochemical... Dow AgroSciences, pardon me. Gentlemen, and Judge Schroeder, you have properly focused on a very important question of whether the agency had a substantial basis for the conclusion of it. And you're properly focused on the studies. I want to talk about those studies because there are some misconceptions on the bench. First, two of those studies met the OECD standard. They are the two of the first two Schroeder studies. Schmitzer studies, pardon me. Schmitzer. No, I'm sorry. I apologize, Judge Schroeder. Schroeder wouldn't want her name on those yet. But equally important, let me explain why the taken together, the six studies that EPA have sustain and constitute substantial evidence for the decision that was made here. Not the conditional registration proposal but the ultimate decision. Two of the studies, the Ether study, starts with a Y, but it's pronounced I am told Ether study. And the Heck-Rose study measured the effects at the longer term measured the effects at the approved rate. They also double checked the Tier 1 studies. Tier 1 studies are the basic, is there toxicity to this? And one of the things that they found was that about 97% of the bees were not affected even by, at a Tier 1 level, toxicity. One of the things they determined. But more important, the Ether study determined that a rate 154% higher than the ultimately approved rate there was no effect on colony strength at 17 days. The Heck-Rose study which was done at a similar rate Did the Ether study have biological effects as opposed to residues? It provided the information to allow those conclusions. Although it was a residue study, it also provided the information on which EPA could rely. The purpose of the study was Was there an evaluation of that data as part of the EPA process? Yes sir. Where's that in the record? It's the DER what EPA refers to as the data evaluation reports are in the record. Specifically to the data in the Ether study that was residue data? Yes sir. And provides its biological effects? It reported on the effect on the hive at the end of the time period. And it compared the hive not to a control but to the original hive. That's why they referred to it as the residue. That was the shortcoming as a residue study. If it had been designed not as a residue study there would have been a control hive. There was no control hive in that particular study. There was a control hive in the Heck Rose study which is the other one that went at the levels that were ultimately approved and it found that the measured impact on the hive was well within the assimilative capacity of the hive. Which is to say that you can have some bees that die but the hive still survives and thrives. Of the other four studies, two of those were indeed the OECD studies that Judge Smith was asking about. They did meet the OECD standard. Now it's important to understand and this is well described in the record in the white paper that was prepared by EPA and the Canadian government and the California Department of Pest Management that we are developing the technology to make some of these judgments and there are shortcomings in all of the studies. The tier two studies for example the two that met the OECD standard the two that were the so called Schmitzer studies found that simply running the test killed between 55 and 65% of the bees in the hives. And there was only a very marginal increase from the impact of there being the sulfoxaphore also being used and it was used at a lower rate than was ultimately approved. I was going to say that was a lower rate. But the lower rate is not all that continues this is why the expertise of the agency is relevant here. There are things that are learned from these studies not withstanding the fact that they are done at lower rates and the things that are learned are directly relevant to what you were asking about Judge Smith. That is they showed that there was no effect on brood. Now brood is the portion of the bees between eggs and the time that they become adult bees. The study showed that there was no effect on the brood at that earlier time period, pardon me, at that lower rate  ultimately the hives were fine but that where there was a product that was known to be deadly to the bees it had a dramatic effect on them. So those studies and that was true about all four of these studies those studies controlled allow the agency to make a determination about the brood strength. That information is in the agency described in the response to comment documents repeatedly around page 230 and the PER 230 that is the record submitted by the government. Those six studies together allowed EPA to conclude that there was no unacceptable impact on the hives. Now that goes directly to the concern of EPA's evaluation of the impact on the beekeepers because if there is no effect on the beehives there is no effect on the beekeepers. And EPA balanced against that as it was required to do by the statute the substantial benefits of this particular product. And one of the remarkable things about this entire case is how little attention there has been on the benefits of this product to the bees. This product is between 5 and 97 percent less toxic to bees than the chemicals it is going to replace. This product replaces the organophosphates, it replaces the carbamates, it replaces the neonicotinoids. It has a lower impact on any of those. 6.3 percent of the OPs used in the United States are going to be replaced by this product. The record is replete with comments from growers who are talking about very substantial impacts on their livelihoods from crops that either can't be controlled with the current chemicals, those that are being replaced here, or are controlled only with huge amounts of repeated applications. Much higher. Yes, sir. I appreciate it, Your Honor. My point is this. EPA, this is a very simple administrative law case. EPA is required to make a judgment about whether or not on balance this is a good product. EPA made that judgment. The record shows they had a basis to conclude that at the rate approved, lower than the proposed rate, the product met the safety standard, did not have a deleterious impact on bees, overall, and that there were very, very substantial needs for this product. And that is sufficient with a substantial evidence standard for this panel, in our view, to affirm the agency determination. Judge Schroeder and I asked some questions and Mr. Doe said somebody would identify the record page in which the EPA you said approved at the .09 level at the time of the preliminary action. Do you have that record site? Yes, sir. It wasn't really a preliminary action, but in that... All I want is the record site. All I want is the conditional the record site for the conditional permit that suggests... It's at page PER 000182 But it didn't approve... You'll read it, Your Honor, and you'll see that is the reference to .09 at that point. Thank you. Just a few points here, Your Honor. First, I want to respond directly to this question about what the proposed registration decision found. It's actually at the record at page PER 183. What they find is, I'll quote, data currently on file indicate the sulfoxyfluoride applications will not result in a catastrophic loss to brood during the time required for conditional studies to be performed and assessed. So, in other words, this is a different standard. They're not saying no unreasonable risk forevermore. They're saying we're not going to have a catastrophic failure during the time that it's going to take you to perform and submit this information that we're missing. I wanted to respond just very briefly, and then I will sum up to this point about sulfoxyfluoride's relative toxicity to other pesticides. I just want to point out that all of these statements are comparing sulfoxyfluoride's acute toxicity to other pesticides. Acute toxicity is significant because that's how much of the pesticide it will take to kill the bee dead, and we recognize that there are other pesticides that might be more potent in that respect. But the key with colony collapse disorder that we're seeing is the systemic nature of these pesticides like sulfoxyfluoride. Other pesticides like organophosphates may be very deadly on contact, but they don't get into the pollen and the nectar. They're not taken back to the hive, fed to the brood, and make the whole hive collapse. When you say systemic, you mean that it goes into the plant itself? Yes. It's actually absorbed into the plant and makes the plant itself toxic, which is why these things are so insidious. You can drip them into the ground and they're taken up into the roots and the next thing, the whole plant is toxic to bees. I just want to say that we recognize that EPA pretty much gets to write the rules when it comes to registering pesticides. The agency gets to promulgate the regulations that tell us what information is necessary and they get to decide how that is distributed in a risk assessment process. But having made those rules, EPA has to live by them. In this case, EPA played by the rules, ran its numbers, and found, lo and behold, the use of this pesticide, even at the mitigated rate, will exceed our level of concern. That means we need Tier 2 studies. Lo and behold, even at the mitigated rates, the Tier 2 studies are not answering the question. They're inconclusive. We need to go to this cost-benefit phase of things. They're entitled to do that, but they have to do a full weighing, they have to get the information, they have to tell us what's actually at stake in terms of costs to the beekeeping industry and the crops that rely on bees for pollination. Thank the Court for its attention. Unless the Court has any questions. Thank you. Appreciate your argument. We appreciate both arguments. They were very good. Thank you very much. Very difficult case. Very interesting case for all of us. We've tried to focus exactly where we needed to go in order to make that happen, so we appreciate your arguments. At this point, Case 1372346 is submitted.
judges: Kronstadt, Schroeder, Smith